**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**NORFOLK DIVISION**

**EUGENE DEWITT COSTINE,**

> **Plaintiff,**

> **v.**                                           **ACTION NO. 2:19cv53**

**CORRECT CARE SOLUTIONS, LLC,**
**and HAMPTON ROADS REGIONAL**
**JAIL AUTHORITY,**

> **Defendants.**

**OPINION AND ORDER**

The plaintiff, Eugene Dewitt Costine ("Plaintiff"), filed this 42 U.S.C. § 1983 action

against the defendants, Correct Care Solutions, LLC and Hampton Roads Regional Jail Authority,

seeking $10 million in damages stemming from the amputation of his left foot in June 2017, which

Plaintiff claims was caused by the allegedly negligent medical care he received as an inmate in

Hampton Roads Regional Jail in Portsmouth, Virginia, from 2016 to 2017.  Defendant Correct

Care Solutions, LLC ("CCS") moved for summary judgment or, in the alternative, requested that

the Court grant its pending motions in limine.  ECF Nos. 46, 48, 50.

The Court concludes that oral argument is unnecessary because the facts and legal

arguments are adequately presented in the briefs.  For the reasons stated herein, Defendant CCS's

Motion for Summary Judgment is **GRANTED**.  ECF No. 50.  Because the Court has determined

summary judgment is warranted in favor of Defendant CCS, the remaining motions in limine—

and Plaintiff's motions for extension to reply to said motions in limine—are **DISMISSED as**

**moot**, ECF Nos. 46, 48, 57, 59.  Lastly, Defendant CCS's Motion for Leave to File Supplemental

1

Brief and Plaintiff's Motion to Amend his Expert Witness Report are **DISMISSED as moot**.  ECF Nos. 55, 61.

## I.    FACTUAL AND PROCEDURAL HISTORY

A summary of the relevant facts follows, with Plaintiff's objections identified herein.  In late-2014, physicians at VCU Medical Center in Richmond informed Plaintiff, a patient suffering from diabetes and morbid obesity, that a bilateral amputation was in his best interest due to the diabetic ulcers on his feet.  Plaintiff's Medical Records, attached as Ex. A to CCS's Mem. in Supp. of Mot. for Summ. J., ECF No. 51-1 at 1–5.  Plaintiff agreed to the same, but later withdrew him consent, as his surgeon indicated, "It had been my preference to proceed with below-knee amputations.  The patient declined to do that and I was [sic] felt that I had no choice, but to proceed as I did."  Id. at 6–7, 8–10.  Plaintiff's condition persisted over the next few years, as his primary care physician, Dr. Eugene Link documented on June 7, 2016 that Plaintiff's foot ulcers had become "severe" and that "it did not seem like we're making process" with said ulcers.  Id. at 11–14.

Plaintiff arrived at the Hampton Roads Regional Jail Authority ("HRRJA") in October 2016 and developed a fever soon afterward on October 21, 2016.  Accordingly, CCS, the medical provider at HRRJA, sent Plaintiff to the emergency room at the Maryview Medical Center on October 22, 2016, where he underwent debridement of his left heel by Dr. Peter Grinkewitz, a podiatrist.  Plaintiff's Medical Records, attached as Ex. B (Part 1) to CCS's Mem. in Supp. of Mot. for Summ. J., ECF No. 51-2 at 1–2.  Plaintiff was discharged on October 28, 2016 with corresponding instructions.  Id. at 3–9.  On that same date, Dr. Virginia Chebou, a CCS medical provider, made the following orders, among others, per Plaintiff's discharge instructions from Maryview: weekly labs, infused antibiotics "as prescribed," wound VAC (vacuum-assisted closure) care to the left foot "as prescribed," and application of quarter-strength Dakin's antiseptic

solution to left heel with dressing.  Id. at 10.  Dr. Chebou duly admitted Plaintiff to HRRJA's infirmary with the diagnosis of "acute osteomyelitis[1] of the left foot."  Id. at 11–14.

### A.    CCS's Post-Debridement Care of Plaintiff

The following is a summation of the evaluations that Plaintiff received during the relevant time period leading up to his below-the-knee amputation of his left leg on June 10, 2017.  On October 29, 2016, Plaintiff's progress notes indicate that his wound VAC was not working correctly.  Id. at 15–16.  In response, CCS personnel ordered wet-to-dry dressings until additional wound VAC supplies were available.  Id. at 17–18.  The wound VAC became available again on November 2, 2016 and was to be changed every Monday, Wednesday, and Friday.  Id. at 19. Meanwhile, Dr. Chebou indicated that CCS booked a follow-up appointment with an outside podiatrist.  Id. at 21.

On November 10, 2016, Plaintiff admitted to Dr. Chebou that he purchased foods at the HRRJA canteen, to which Dr. Chebou responded by educating Plaintiff "about the importance of following his [American Diabetes Association] diet and avoiding sugars and starches as uncontrolled [blood sugar] will impair wound healing."  Id. at 24.  CCS later began testing Plaintiff's blood glucose levels as part of his diabetes treatment, a success even conceded by Plaintiff's expert, Dr. Brobson Lutz, when he stated "That's pretty damn good control" in reference to CCS's regime to manage Plaintiff's diabetes.  Dr. Brobson Lutz Dep., attached as Ex. F, ECF No. 51-8, at 75:12–19.

On November 11, 2016, Dr. Chebou noted "[s]ignificant improvement of left heel open wound with progressive closure of the center crater.  Good granulation tissue, odor is marginal."

---

[1] According to Mayo Clinic, osteomyelitis is a bone infection.  Osteomyeltis, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/osteomyelitis/symptoms-causes/syc-20375913 (last visited Apr. 28, 2020).

Ex. B at 21.  On November 14, 2016, because Plaintiff reported that the wound VAC was not working properly, Dr. Chebou advised that wet-to-dry dressings should be utilized and that she would reassess Plaintiff on the following day.  Id. at 27.  On November 16, 2016, Dr. Chebou noted "marked improvement of the skin maceration around the wound on the left heel" and indicated that she would check the left heel x-ray in the follow-up.  Id. at 30–31.  On November 21, 2016, Dr. Chebou followed-up with Plaintiff and advised that there was no evidence of osteomyelitis based on the left heel x-ray.  Id. at 36.  On November 22, 2016, Dr. Chebou indicated that wet-to-dry dressings should be continued as the wound VAC was causing "maceration and trauma of the skin around the wound . . . ."  Id. at 33.  On November 29, 2016, Plaintiff had a follow-up appointment with his outside podiatrist, Dr. Grinkewitz, who recommended that CCS continue wound care.[2]  Id. at 38.

On December 1, 2016, Dr. Ousama Ghaibeh, a CCS provider, discontinued wet-to-dry dressing of Plaintiff's left heel and started daily application of medihoney dressing, gauze, and kerlix bandages.  Id. at 39.  On December 9, 2016, Dr. Ghaibeh discontinued the medihoney dressing and ordered use of wet-to-dry dressings again.  Id. at 40.  On December 13, 2020, Plaintiff was discharged from the infirmary by Dr. Donald Rhodes, a CCS provider, who noted that Plaintiff would be seen daily for wound care.  Id. at 41–42.

Dr. Grinkewitz, Plaintiff's outside podiatrist, met with Plaintiff again on December 14, 2016.  Id. at 43.  Dr. Grinkewitz noted that the wound was reduced in size and depth and recommended "continu[ation of] present wound care."  Id.

---

[2] In his Response to CCS's Motion for Summary Judgment, Plaintiff objects to this depiction, stating that Dr. Grinkewitz did not recommend continuation of said wound care.  ECF No. 56 at 3.  Plaintiff includes no supporting documentation for this assertion.  See id.

On December 21, 2016, Dr. Ghaibeh identified a pressure ulcer on Plaintiff's left foot that developed due to compression caused by Plaintiff's bed. Id. at 44–46. Dr. Ghaibeh then cleaned said ulcer, modified Plaintiff's wound care accordingly to include soaking Plaintiff's foot in warm water, and continued dressing changes. Id. Wound care flow sheets indicate that Plaintiff received one hundred sixty (160) dressing changes between December 21, 2016 and February 11, 2017. Id. at 47–78.

On January 5, 2017, Plaintiff had another appointment with Dr. Grinkewitz, his outside podiatrist, who stated that Plaintiff's left heel ulcer had decreased in size and depth and recommended continuation of pressure wound care. Id. at 79.

On February 22, 2017, Dr. Melissa Morton-Fishman, a CCS provider, advised that Plaintiff's left heel ulcers were "improving" and applied a Unna boot, indicating that she would follow-up with Plaintiff on February 27, 2020 to change said Unna boot.[3] Plaintiff's Medical Records, attached as Ex. B (Part 2) to CCS's Mem. in Supp. of Mot. for Summ. J., ECF No. 51-3 at 81–82. As planned, Dr. Morton-Fishman followed-up with Plaintiff on February 27, 2017, stating that the "Unna boot has maintained good compression on [Plaintiff's] foot and calf . . . ." Id. at 84. The Unna boot was reapplied, and Dr. Morton-Fishman stated that dressing changes would be done every two days given the amount of drainage.[4] Id. Plaintiff was scheduled for a follow-up on March 1, 2017. Id.

---

[3] In his Response to CCS's Motion for Summary Judgment, Plaintiff objects to this depiction, stating that he performed the Unna boot application himself. ECF No. 56 at 3. Plaintiff includes no supporting documentation for this assertion. See id.

[4] In his Response to CCS's Motion for Summary Judgment, Plaintiff objects to this depiction, stating that he performed the Unna boot application himself. ECF No. 56 at 3. Plaintiff includes no supporting documentation for this assertion. See id.

On March 1, 2017, Dr. Morton-Fishman replaced Plaintiff's Unna boot and recommended continued dressing changes.[5] Id. at 90. On March 7, 2017, Plaintiff met with Dr. Grinkewitz, his outside podiatrist, who recommended that CCS continue its current wound care on Plaintiff. Id. at 93. On that same day, Plaintiff was seen by Olga Barton, a CCS nurse, for a temperature of 101.8 degrees. Id. at 95. This information was relayed to Dr. Morton-Fishman, who ordered Bactrim, an antibiotic, and ibuprofen for Plaintiff. Id. Plaintiff was also scheduled for a doctor's appointment for the following morning. Id. As scheduled, on March 8, 2017, Dr. Rhodes noted that Plaintiff complained of a low-grade fever the night before and was placed on Bactrim, as discussed above. Id. at 92. Dr. Rhodes also replaced Plaintiff's Unna boot, indicating that there was no "increased drainage or discharge from the wound . . . ."[6] Id.

On March 10, 2017, Dr. Morton-Fishman saw Plaintiff and noted that Plaintiff "remained compliant with dressing changes as ordered." Id. at 99. She ordered continued Unna boot changes every two days. Id. On March 14, 2017, Dr. Rhodes indicated that Plaintiff's "heal [sic] wound is continuing to heal/shrink" and that there were "no signs of infection." Id. at 101. Accordingly, Dr. Rhodes replaced Plaintiff's Unna boot and scheduled a follow-up for two days later. Id.

On March 16, 2017, Dr. Morton-Fishman continued Unna boot changes every two days, while increasing Plaintiff's Cymbalta dosage due to an increase in pain. ECF No. 103. On March 20, 2017, Dr. Morton-Fishman again ordered continuation of Unna boot changes every two days and renewed Plaintiff's Tramadrol prescription for pain. Id. at 105. On March 24, 2017, Dr. Rhodes evaluated Plaintiff and recommended continuation of the current wound management

---

[5] In his Response to CCS's Motion for Summary Judgment, Plaintiff objects to this depiction, stating that he performed the Unna boot application himself. ECF No. 56 at 3. Plaintiff includes no supporting documentation for this assertion. See id.

[6] In his Response to CCS's Motion for Summary Judgment, Plaintiff objects to this depiction, stating that he performed the Unna boot application himself. ECF No. 56 at 3. Plaintiff includes no supporting documentation for this assertion. See id.

regime. Id. at 107. On March 29, 2017, Plaintiff once again met with Dr. Rhodes, who recommended continuation of the current treatment plan, considering Plaintiff advised of no new issues since the last visit. Id. at 109. Accordingly, Nurse Barton changed Plaintiff's Unna boot on March 31, 2017. Id. at 111.

On April 17, 2017, Dr. Grinkewitz, Plaintiff's outside podiatrist, evaluated Plaintiff and recommended continuation of the treatment plan, as Plaintiff's left heel ulcer had improved. Id. at 112. On April 20, 2017, Shannon Pifer, a CCS nurse, evaluated Plaintiff, and Plaintiff completed his Unna boot replacement "with minimal nursing assist[ance]" while "demonstrate[ing] appropriate technique."[7] Id. at 114.

On May 7, 2017, Patrick Dolan, a CCS licensed practical nurse, completed Plaintiff's Unna boot change and indicated that a provider would assess Plaintiff's left heel ulcer at the next Unna boot change. Id. at 116. On May 16, 2017, while receiving wound care for his right foot, Nurse Pifer noted that Plaintiff was afebrile and lethargic; however, Plaintiff denied any chills or feelings out of the ordinary. Id. at 118. Dr. Morton-Fishman evaluated Plaintiff on May 18, 2017 for his Unna boot change, indicating that the same was "continuing to improve" and ordering continuation of the Unna boot applications. Id. at 120. However, Plaintiff presented with increased pain in his right foot, so Dr. Morton-Fishman ordered an x-ray of the same. Id.

On May 22, 2017, an x-ray was taken of Plaintiff's right foot, which indicated "no radiographic evidence of osteomyelitis." Id. at 121. On that same day, Dr. Rhodes advised that the x-ray contained "no signs of osteomyelitis" and ordered continued Unna boot and dressing changes. Id. at 123. On the following day, Dr. Grinkewitz, Plaintiff's outside podiatrist, evaluated

---

[7] In his Response to CCS's Motion for Summary Judgment, Plaintiff objects to this depiction, stating that Nurse Pifer indicated in her deposition that Plaintiff had never applied a Unna boot before and could not know proper technique for applying the same. ECF No. 56 at 3. Plaintiff includes no supporting documentation for this assertion. See id.

Plaintiff and determined that the left heel ulcer was "clean" and continued to improve. Id. at 124. Accordingly, Dr. Grinkewitz recommended continued local wound care. Id. Plaintiff's Unna boot was changed as recommended on May 24, 2017; May 26, 2017; May 29, 2017; May 31, 2017; and June 2, 2017. Id. at 125–34.

On June 6, 2017, Dr. Rhodes evaluated Plaintiff and noted that Plaintiff's left foot was healing, with "healthy tissue no drainage." Id. at 136. On June 11, 2017, Plaintiff reported to Penny Tatro, a CCS nurse, who determined that he was experiencing chills and malaise and had a temperature of 98.6 degrees. Id. at 140–45. On June 12, 2017, Plaintiff reported to Shaun Heafner, a CCS nurse, who discovered that Plaintiff felt like he was "going to pass out" and felt "under the weather." Id. at 147. Accordingly, Plaintiff was brought to medical. Id.

On that same day, Plaintiff was seen by LaToya Burke, a CCS nurse practitioner, who ordered labs and cultures to rule out sepsis based on how Plaintiff presented. Id. at 149. Nurse Practitioner Burke consulted with Dr. Morton-Fishman and the nurse who frequently changed Plaintiff's Unna boot. Id. Later that day, Plaintiff was seen by Kathryn Topham, a CCS nurse, who indicated that Plaintiff's temperature was 102.4 degrees and his blood pressure was 90/54. Id. at 151. After relaying this information to Dr. Morton-Fishman, Dr. Morton-Fishman ordered that Plaintiff be brought to the emergency room at Sentara Norfolk General Hospital. Id.; see also id. at 151–56.

### B. Plaintiff's Below-the-Knee Amputation

A subsequent MRI revealed that Plaintiff had osteomyelitis in his left heel and sepsis. Plaintiff's Medical Records, attached as Ex. B (Part 3) to CCS's Mem. in Supp. of Mot. for Summ. J., ECF No. 51-4 at 157, 166.

On June 15, 2017, providers at Sentara Podiatry Specialists noted:

This is an unfortunate situation as the MRI shows extensive osteomyelitis throughout almost the entire calcaneus. He is not a candidate for local wound debridement and partial calcanectomy given the extent of the infection, would likely best be served by primary [below-the-knee amputation] as he is high risk for recurrent infections, hospitalization and will need extended IV therapy and likely will be on oral therapy for chronic suppression of osteomyelitis if he chooses conservative management.

Id. at 158–59. Providers at Sentara Vascular Specialists further indicated:

[Plaintiff] was [sic] been dealing with bilateral foot wounds for 3 years. . . . Per patient a couple years ago he was told that he may lose both legs. His right foot has been healing well. His left foot has been worsening and becoming more swollen over the last couple days.

Id. at 166. On June 10, 2017, Plaintiff underwent a below-the-knee amputation on his left leg. Id. at 172. Plaintiff returned to HRRJA on June 26, 2017. Id. at 176.

### C.    Procedural History

On January 29, 2019, Plaintiff filed the instant action against defendants CCS and HRRJA seeking $10 million in damages for injuries sustained due to the allegedly inadequate medical care Plaintiff received while incarcerated at the HRRJA. Complaint, ECF No. 1 (hereinafter "Compl."). On March 1, 2019, defendant CCS filed its answer to the complaint along with several affirmative defenses. ECF No. 14. On March 20, 2019, defendant HRRJA filed its answer to the complaint along with several affirmative defenses. ECF No. 18.

On March 20, 2019, HRRJA also filed a Motion to Dismiss the complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP") along with a supporting memorandum. ECF Nos. 16, 17. The motion was fully briefed. See Plaintiff's Response, ECF No. 22, and HRRJA's Reply, ECF No. 23. On June 24, 2019, the Court conducted a hearing on the same. By Order dated July 2, 2019, the Court granted HRRJA's Motion to Dismiss, dismissing HRRJA as a defendant from the case and indicating that Plaintiff's action should proceed against

the non-moving defendant, CCS. ECF No. 29.

On October 10, 2019, CCS filed a Motion for Judgment on the Pleadings pursuant to Rule 12(c) of the FRCP along with a supporting memorandum ("Mem."). ECF Nos. 31, 32. Plaintiff failed to respond. By Order dated November 1, 2019, the Court granted CCS's Motion for Judgment on the Pleadings, thereby dismissing Plaintiff's complaint without prejudice. ECF No. 33. Further, the Court granted Plaintiff an opportunity to file an amended complaint within fourteen days of the date therein. Id.

Accordingly, Plaintiff filed his Amended Complaint (hereinafter "Am. Compl.") on November 13, 2019, ECF No. 35, to which CCS filed its Answer on November 26, 2019, ECF No. 39. On November 26, 2019, CCS filed its Motion to Dismiss or, in the Alternative, Strike Counts I, V, VI, and VII of Plaintiff's First Amended Complaint ("Motion for Partial Dismissal") along with a supporting memorandum. ECF Nos. 40, 41. Plaintiff failed to respond. On February 18, 2020, the Court granted CCS's Motion to Dismiss or Strike, thereby retaining jurisdiction over Counts II–IV, while dismissing Counts I, V–VII without prejudice. ECF No. 42.

On March 19, 2020, CCS filed its first motion in limine titled "Motion to Preclude Plaintiff from Offering Expert Opinions at Trial that are not Contained in his Expert Disclosure" ("First Motion in Limine") along with a supporting memorandum. ECF Nos. 46, 47. On that same day, CCS file a second motion in limine titled "Motion in Limine to Exclude the Causation Opinion of Dr. Lutz" ("Second Motion in Limine") along with a supporting memorandum. ECF Nos. 48, 49. On March 25, 2020, CCS filed its Motion for Summary Judgment and supporting memorandum. ECF Nos. 50, 51. CCS filed numerous attachments with its Motion for Summary Judgment, including medical records, depositions, and expert reports. See ECF No. 51-1, 51-2, 51-3, 51-4, 51-5, 51-6, 51-7, 51-8, 51-9, 51-10, 51-11, 51-12.

On April 17, 2020, CCS filed a Motion for Leave to File a Supplemental Brief ("Motion for Leave"). ECF No. 55.  On that same day,[8] Plaintiff filed his Response to CCS's Motion for Summary Judgment (ECF No. 56); Motion for Extension of Time to File Response to the First Motion in Limine ("First Motion for Extension") and supporting memorandum (ECF Nos. 57, 58); Motion for Extension of Time to File Response to the Second Motion in Limine ("Second Motion for Extension") and supporting memorandum (ECF Nos. 59, 60); and Motion to Amend his Expert Witness Report ("Motion to Amend") (ECF No. 61).  Plaintiff filed no attachments with his Response to CCS's Motion for Summary Judgment.  See ECF No. 56.

On April 23, 2020, CCS filed its Reply to Plaintiff's Response regarding CCS's Motion for Summary Judgment.[9]  ECF No. 63.  Plaintiff filed a supporting memorandum for his Motion to Amend on April 24, 2020.  ECF No. 64.  On April 24, 2020, CCS filed its Response to Plaintiff's First Motion for Extension and Second Motion for Extension.  ECF No. 65.

CCS's motions in limine, Motion for Summary Judgment, and Motion for Leave, as well as Plaintiff's motions for extension and Motion to Amend, are now before the Court.  ECF Nos. 46, 48, 50, 55, 57, 59, 61.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate only when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine dispute

---

[8] Such filing practices are not uncommon for Plaintiff.  As discussed above, Plaintiff has failed to respond to the following motions: CCS's Motion for Judgment on the Pleadings (ECF No. 31), Motion for Partial Dismissal (ECF No. 40), and motions in limine (ECF Nos. 46, 48).  Plaintiff also essentially missed his deadline to respond to CCS's Motion for Summary Judgment, as he only invoked an extension due to the United States District Court for the Eastern District of Virginia's General Order No. 2020-07—which extended deadlines for filings currently due on or before April 14th because of the COVID-19 ("coronavirus") outbreak—on April 9, 2020, the day after his response deadline.  The Court does not take lightly Plaintiff's failure to respond on numerous occasions and otherwise patchworked effort to remediate said inaction after the fact.

[9] On April 24, 2020, CCS filed a Corrected Reply, representing that it had uploaded the wrong document.  ECF No. 66.

11

"as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see also Fed. R. Civ. P. 56(a); Seabulk Offshore, Ltd. v. Am. Home Assur. Co., 377 F.3d 408, 418 (4th Cir. 2004). "A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party . . . [and] [a] fact is material if it might affect the outcome of the suit under the governing law." Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 568 (4th Cir. 2015) (citations omitted). The moving party has the initial burden to show the absence of an essential element of the nonmoving party's case and to demonstrate that the moving party is entitled to judgment as a matter of law. Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 185 (4th Cir. 2004); McLean v. Patten Cmtys., Inc., 332 F.3d 714, 718 (4th Cir. 2003); see Celotex, 477 U.S. at 322–25.

When the moving party has met its burden to show that the evidence is insufficient to support the nonmoving party's case, the burden then shifts to the nonmoving party to present specific facts demonstrating that there is a genuine issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986); Honor, 383 F.3d at 185; McLean, 332 F.3d at 718–19. Such facts must be presented in the form of exhibits and sworn affidavits. Celotex, 477 U.S. at 324; see also M&M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc., 981 F.2d 160, 163 (4th Cir. 1993). In order to successfully defeat a motion for summary judgment, the nonmoving party must rely on more than conclusory allegations, "mere speculation," the "building of one inference upon another," the "mere existence of a scintilla of evidence," or the appearance of "some metaphysical doubt" concerning a material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002); Tao of Sys. Integration, Inc. v. Analytical Servs. & Materials, Inc., 330 F. Supp. 2d 668, 671 (E.D. Va. 2004). Rather, there must be sufficient evidence that would enable a reasonable fact-finder to

12

return a verdict for the nonmoving party. See Anderson, 477 U.S. at 252.

Although, at the summary judgment phase, the Court is not "to weigh the evidence and determine the truth of the matter," the Court is required to "determine whether there is a genuine issue for trial." Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014) (quoting Anderson, 477 U.S. at 249); see also Jacobs, 780 F.3d at 568–69. Therefore, in determining whether there is a genuine issue for trial, the Court does not weigh the evidence to make a truth determination; rather, "[t]he relevant inquiry is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Stewart v. MTR Gaming Grp., Inc., 581 F. App'x 245, 247 (4th Cir. 2014) (quoting Anderson, 477 U.S. at 251–52).

## III.    CCS'S MOTION FOR SUMMARY JUDGMENT

In its Motion for Summary Judgment, CCS contends that the Court should grant summary judgment in its favor because Plaintiff's claims do not amount to a constitutional violation. In other words, no reasonable jury could find that Plaintiff was treated with deliberate indifference. ECF No. 51 at 16. Further, CCS argues secondarily that—even if Plaintiff was treated with deliberate indifference—Plaintiff's remaining claims should be dismissed because the record does not support a valid claim for liability under Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 694 (1978). Id. at 20. For the reasons that follow, the Court agrees that summary judgment should be granted in CCS's favor.

### A.    APPLICABLE LAW

To establish that inadequate medical treatment rises to the level of a constitutional violation of the Eighth Amendment, a plaintiff "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976). Thus, a plaintiff must allege two distinct elements to state a claim upon which relief can

13

be granted. First, he must allege a sufficiently serious medical need. See, e.g., Cooper v. Dyke, 814 F.2d 941, 945 (4th Cir. 1987) (determining that intense pain from an untreated bullet wound is sufficiently serious); Loe v. Armistead, 582 F.2d 1291, 1296 (4th Cir. 1978) (concluding that the "excruciating pain" of an untreated broken arm is sufficiently serious).

Second, he must allege deliberate indifference to that serious medical need, a very high standard that cannot be met by mere negligence. Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999) (citing Estelle, 429 U.S. at 105–06). More specifically,

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

Farmer v. Brennan, 511 U.S. 825, 837 (1994). Farmer teaches "that general knowledge of facts creating a substantial risk of harm is not enough. The prison official must also draw the inference between those general facts and the specific risk of harm confronting the inmate." Johnson v. Quinones, 145 F.3d 164, 168 (4th Cir. 1998) (citing Farmer, 511 U.S. at 837); see Rich v. Bruce, 129 F.3d 336, 338 (4th Cir. 1997). Thus, to survive a motion for summary judgment, the deliberate indifference standard requires a plaintiff to demonstrate that "the official in question subjectively recognized a substantial risk of harm" and "that the official in question subjectively recognized that his actions were 'inappropriate in light of that risk.'" Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 303 (4th Cir. 2004) (quoting Rich, 129 F.3d at 340 n.2).

Accordingly, "[t]o establish that a health care provider's actions constitute deliberate indifference to a serious need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990), overruled on other grounds by Fidrych v. Marriot Int'l,

Inc., 952 F.3d 124 (4th Cir. 2020). Absent exceptional circumstances, an inmate's disagreement with medical personnel with respect to a course of treatment is insufficient to state a cognizable constitutional claim, much less to demonstrate deliberate indifference. See Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985) (citing Gittlemacker v. Prasse, 428 F.2d 1, 6 (3d Cir. 1970)). Indeed, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Farmer, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. See Brown v. Harris, 240 F.3d 383, 390 (4th Cir. 2000) (citing Liebe v. Norton, 157 F.3d 574, 577 (8th Cir. 1998)) (holding that the focus should be on the precautions actually taken in light of the known risk, not those that could have been taken); see also Jackson v. Lightsley, 775 F.3d 170, 179 (4th Cir. 2014) (prescribing treatment raises fair inference that physician believed treatment was necessary and that failure to provide it would pose an excessive risk).

Lastly, while "a prisoner does not enjoy a constitutional right to the treatment of his or her choice, the treatment a prison facility does provide must nevertheless be adequate to address the prisoner's serious medical need." De'lonta v. Johnson, 708 F.3d 520, 525–26 (4th Cir. 2013) (holding that an inmate pleaded a claim for deliberate indifference when the prison would not evaluate her for surgery that was an approved treatment for her serious medical need despite her repeated complaints regarding the ineffectiveness of her current treatment). The right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." Bowring v. Godwin, 551 F.2d 44, 47–48 (4th Cir. 1977).

15

**B.**    **DISCUSSION**

CCS requests a grant of summary judgment as to Plaintiff's three remaining counts (Counts II–IV), all of which center on the fundamental § 1983 allegation that CCS acted with deliberate indifference with regard to Plaintiff's serious medical condition.  More specifically, Count II alleges "denial, delay, and withholding of medical care," asserting that CCS "engaged in this injurious conduct with deliberate indifference."  Am. Comp. ¶ 32.  Count III alleges deliberate indifference based on supervisory liability.  Id. ¶¶ 42–43.  Lastly, Count IV alleges a "policy or custom" of "deliberate indifference to the health care needs of the inmates/detainees . . . ."  Id. ¶ 49.

CCS does not dispute the first prong under the deliberate indifference standard: Plaintiff suffered from a serious medical need.  ECF No. 51 at 17.  Given this concession, the Court is only concerned with the subjective prong of the deliberate-indifference standard.  Regarding the subjective prong, CCS contends that Plaintiff cannot establish that CCS's actions rose to the level of deliberate indifference toward Plaintiff's serious medical need.  Id.  The Court agrees and will assess Plaintiff's remaining counts accordingly.

**1.**    **Count II – Denial, Delay, and Withholding of Medical Care Through Deliberate Indifference**

In Count II, Plaintiff alleges "denial, delay, and withholding of medical care," asserting that CCS "engaged in this injurious conduct with deliberate indifference."  Am. Comp. ¶ 32.  In his Response to CCS's Motion for Summary Judgment, Plaintiff further asserts that "CCS's staff failed to properly treat Plaintiff and timely diagnosis [sic] his chronic osteomyelitis . . . ."  ECF No. 56 at 1.  In addition, Plaintiff asserts that CCS "was deliberate indifference [sic] because

Plaintiff was required to perform his own wound care with the Unna boot[10] as well as with some

of his wound bandage changes." Id. at 4. Lastly, Plaintiff goes on to essentially assert failure to

diagnose, stating that "CCS allegedly found no evidence of osteomyelitis in their May 22, 2017 x-

ray. Sentara found chronic osteomyelitis, not acute, on June 13, 2017 after performing additional

tests." Id.

However, considering the record, the Court finds no facts to suggest that CCS acted with

the necessary state of mind to support a viable § 1983 claim, as is evidenced by CCS's constant

participation in Plaintiff's care. Review of the record reveals that Plaintiff was sent to the hospital

and administered antibiotics when he developed a fever shortly upon arriving at the HRRJ;

---

[10] Although Plaintiff duly seeks to highlight in his Response that there are material facts still in dispute—namely, whether Plaintiff performed his own wound care with regard to the Unna boot—Plaintiff's attempt falls short of the requisite standard. Indeed, Plaintiff provides no support for his supposed objections to CCS's depiction of the case facts. As discussed above, such facts must be presented in the form of exhibits and sworn affidavits. Celotex, 477 U.S. at 324; see also M&M Med. Supplies & Serv., 981 F.2d at 163. In order to successfully defeat a motion for summary judgment, the nonmoving party must rely on more than conclusory allegations, "mere speculation," the "building of one inference upon another," the "mere existence of a scintilla of evidence," or the appearance of "some metaphysical doubt" concerning a material fact. Anderson, 477 U.S. at 252; Thompson, 312 F.3d at 649; Tao of Sys. Integration, 330 F. Supp. 2d at 671.

Here, CCS's Motion for Summary Judgment is replete with attachments, including medical records, depositions, and expert reports to bolster its assertions and depiction of the facts. See ECF No. 51-1, 51-2, 51-3, 51-4, 51-5, 51-6, 51-7, 51-8, 51-9, 51-10, 51-11, 51-12. However, the Court is cognizant of the fact that CCS has not submitted these medical records in admissible form. Nonetheless, these medical records could be admissible if they were accompanied by an affidavit from the custodian of the records to authenticate the records and establish that they were kept in the course of regular business. See Fed. R. Evid. 803(6). Therefore, because Plaintiff has not "object[ed] that the materials" submitted "cannot be presented in a form that would be admissible in evidence," and because the Court perceives no reason why such medical records could not be authenticated if CCS was called upon to do so, the Court could consider their contents undisputed for purposes of the summary judgment motion. Fed. R. Civ. P. 56(c)(2), (e)(2); see Jones v. Western Tidewater Reg'l Jail, 187 F. Supp. 3d 648, 654 (E.D. Va. 2016).

In contrast to CCS's Motion for Summary Judgment, Plaintiff filed a Response with no attachments and appears to rely on the allegations contained in his unverified amended complaint. See ECF No. 56. Because Plaintiff's Amended Complaint is not verified, its factual assertions may not be considered in opposition to CCS's Motion for Summary Judgment. See Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991) ("As a general rule, when one party files a motion for summary judgment, the non-movant cannot merely rely on matters pleaded in the complaint, but must, by factual affidavit or the like, respond to the motion."); Fed. R. Civ. P. 56(c)(1)(A); see also Abdelnaby v. Durham D & M, LLC, No. GLR-14-3905, 2017 WL 3725500, at *4 (D. Md. Aug. 29, 2017) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)) (awarding summary judgment for the defendants, because the plaintiff could not "create a genuine dispute of material fact 'through mere speculation,'" and "[t]hus, the Court [wa]s left with a record that [wa]s bereft of evidence supporting any of [the plaintiff's] arguments").

received approximately one hundred sixty (160) dressing changes between December 21, 2016 and February 11, 2017 to improve his heel ulcer; was successfully provided with treatment for his underlying diabetes to improve the healing of said ulcer; and was seen for specialized treatment approximately seven (7) times by an outside podiatrist from October 2016 to May 2017. On only a handful of occasions did Plaintiff express to CCS providers that he was in pain due to his ulcers. At which time, the physicians provided appropriate medication to alleviate said pain and ordered an x-ray of Plaintiff's right foot on one such occasion to investigate the pain further. By all accounts then—including those of CCS's providers and Dr. Grinkewitz, Plaintiff's outside podiatrist—Plaintiff's ulcers were improving. This uncontradicted evidence belies Plaintiff's claims of deliberate indifference.

Even assuming arguendo that Plaintiff has identified a conflict of facts regarding whether he performed his own wound care in relation to the Unna boot applications, the same does not alter the calculus leading to the Court's conclusion that summary judgment is appropriate. More specifically, in his Response to CCS's Motion for Summary Judgment, Plaintiff lodges objections to CCS's depiction of the case facts, namely in regard to five instances where a CCS provider changed Plaintiff's Unna boot. ECF No. 56 at 3. In said objections, Plaintiff claims—without attaching any documentation in his Response to support said claim—that he himself performed the Unna boot applications. See id.

First and foremost, the Court acknowledges that Plaintiff's medical records conflict with this assertion, as said records document myriad instances where CCS providers applied Plaintiff's Unna boot. For example, the extensive summary of dressing changes and Unna boot applications contained in Plaintiff's medical records demonstrates that Plaintiff's dressings were changed frequently, and the CCS providers varied the prescribed frequency and method in response to the

up-and-down condition of the ulcers. Further, as discussed above, CCS's statement of facts, which Plaintiff fails to contest almost entirely, demonstrates that his doctors wrote wound care orders, managed his diabetes, and set up appointments with Dr. Grinkewitz, Plaintiff's outside podiatrist.

Nonetheless, even if the Court were to assume the truth of Plaintiff's objection, the same would not be material to the deliberate indifference claim. Indeed, nothing in the record demonstrates that CCS's supposed nonapplication of Plaintiff's Unna boot evidenced a conscious disregard of a serious risk of harm to Plaintiff.[11] In other words, even if Plaintiff performed his own Unna boot applications, this is not the same as showing that CCS was deliberately indifferent to Plaintiff's serious medical need, which is required to establish a § 1983 violation. Brauner v. Coody, 793 F.3d 493, 501 (5th Cir. 2015). At worst, CCS's failure to assist Plaintiff in changing his Unna boot is an example of negligence. Luck v. Fox, No. 1:09cv335, 2009 WL 1172860, at *6 (E.D. Va. Apr. 28, 2009) ("[J]ail officials' failure to assist plaintiff in changing plaintiff's bandages is . . . at worst an example of negligence."); Hemby v. Ferrari, No. 9:14cv546, 2016 WL 3166895, at *6–7 (N.D.N.Y. Apr. 18, 2016) (finding no deliberate indifference where the plaintiff claimed the defendants "deprived him of adequate medical care by failing to examine, clean, and dress his ulcer on a daily basis" and the defendants provided the plaintiff "with materials to change his dressing himself in his cell"), report and recommendation adopted by 2016 WL 3172870 (N.D.N.Y. June 6, 2016); Davis v. Gedney, No. 3:11cv501, 2013 WL 4710343, at *9 (D. Nev.

---

[11] In fact, Plaintiff indicated in his deposition that he was familiar with Unna boots, as his home health care nurse assisted him with Unna boot application prior to his incarceration. Pl. Dep., attached as Ex. C, ECF No. 51-5, at 87:3–12. Plaintiff confirmed his knowledge of the same in the following exchange:

> Q.  Did you – did you know how to put [a Unna boot] on from start to finish?
>
> A.  Yeah. From watching [my home health care nurse] perform it.

Id. at 93:4–6. Plaintiff's familiarity with the same is bolstered by his medical records, as Shannon Pifer, a CCS nurse, evaluated Plaintiff on April 20, 2017, noting that Plaintiff completed his Unna boot replacement "with minimal nursing assist[ance]" while "demonstrate[ing] appropriate technique. Ex. B (Part 2) at 114.

Aug. 30, 2013) (same where the plaintiff claimed he should not have been required to change his dressings himself).

At most then, Plaintiff's claims may be considered a disagreement with the medical personnel overseeing his treatment, in effect arguing that CCS's providers should have taken a different course of action in treating Plaintiff's left heel ulcer. See Russell v. Sheffer, 528 F.2d 318, 318–19 (4th Cir. 1975) (holding that "mistreatment or non-treatment must be capable of characterization as 'cruel and unusual punishment' in order to present a colorable claim under § 1983" and that "[q]uestions of medical judgment are not subject to judicial review"); Whitley, 844 F. Supp. at 279 ("While the plaintiff may disagree with [the provider's] assessment and treatment of [the plaintiff], such disagreement does not support a finding of deliberate indifference."). Plaintiff's claims in total—revolving around negligence, failure to diagnose, and disagreement with medical treatment—simply do not support relief under § 1983. Estelle, 429 U.S. at 105–06 (explaining that "an inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind"); see also Farmer, 511 U.S. at 844 ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.").

Based on the record, CCS's actions cannot be said to be "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier, 896 F.2d at 851. Absent admissible evidence that sufficiently contradicts CCS's evidence or creates a genuine dispute of material fact, CCS did not exhibit deliberate indifference toward Plaintiff's serious medical need. Accordingly, CCS's Motion for Summary Judgment will be granted as to Plaintiff's deliberate indifference through denial, delay, and withholding of medical

care claim.

### 2.    **Count III – Supervisory Liability Due to Deliberate Indifference**

Next, Plaintiff alleges that CCS violated his Eighth Amendment rights by its deliberate indifference to the allegedly unconstitutional medical treatment that Plaintiff received and that CCS is subject to supervisory liability. Am. Compl. at ¶¶ 42–43. As this Court has noted:

> To survive summary judgment on the issue of supervisory liability, [the plaintiff] must present a triable issue of fact as to three elements: (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

Woodson v. City of Richmond, Va., 88 F. Supp. 3d 551, 573 (E.D. Va. 2015) (quoting Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994)). Interestingly, Plaintiff does not identify any specific supervisors against which this claim may proceed, as supervisory liability is proven "by pinpointing the persons in the decisionmaking chain whose deliberate indifference permitted the constitutional abuses to continue unchecked." Shaw, 13 F.3d at 798 (quoting Slakan v. Porter, 737 F.2d 368, 376 (4th Cir. 1984)).

Even if the Court were to continue its analysis of this claim despite Plaintiff's failure to identify specific supervisors, Plaintiff's supervisory liability claim fails nonetheless. Underlying such a claim is that Plaintiff suffered a constitutional harm. See Braxton v. Dir. of Health Servs., No. 1:17cv340, 2018 WL 6072003, at *7 (E.D. Va. Nov. 19, 2018) ("[B]ecause [the plaintiff] suffered no constitutional injury with respect to his celery allergy, as discussed above, it is readily apparent that the three defendants named in connection with this claim can have no supervisory liability to him."). However, as discussed supra, the Court has already found that Plaintiff's rights were not violated, as CCS did not act with deliberate indifference to Plaintiff's serious medical

need.  From the record before it then, the Court concludes that Plaintiff has failed to demonstrate that CCS violated his Eighth Amendment rights by its deliberate indifference to the allegedly unconstitutional medical treatment that Plaintiff received.  Accordingly, CCS's Motion for Summary Judgment will be granted as to Plaintiff's supervisory liability claim.

### 3.    Count IV – Official Policy or Custom of Deliberate Indifference

Finally, Plaintiff alleges a violation under § 1983 stemming from official policies or customs concerning the medical treatment CCS provided.  Am. Comp. ¶ 49.  For a private corporation, like CCS, to be liable under § 1983, the plaintiff must show that the entity directly caused the constitutional injury via official policy or custom.  Monell, 436 U.S. at 694.  "[A] private corporation is liable under § 1983 *only* when an official policy or custom of the corporation causes the alleged deprivation of federal rights."  Austin v. Paramount Parks, Inc., 195 F.3d 715, 728 (4th Cir. 1999) (emphasis in original).  A policy or custom for which a municipality may be held liable can arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policy making authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."  Lytle v. Doyle, 326 F.3d 463, 471 (4th Cir. 2003).

As with Plaintiff's supervisory liability claim, Plaintiff's official policy or custom claim cannot proceed absent Plaintiff suffering a constitutional harm.  See Corbin v. Woolums, No. 3:08cv173, 2008 WL 5049912, at * (E.D. Va. Nov. 25, 2008) (granting summary judgment on the plaintiff's official policy or custom claim where the Court found no "unconstitutional deprivation" of the plaintiff's rights).  As discussed above, the Court has established that Plaintiff has not

suffered such a constitutional harm.  Accordingly, viewing all of the evidence in the light most favorable to Plaintiff as the non-movant, Plaintiff's remaining count nonetheless fails to establish an actionable § 1983 violation.  Accordingly, CCS's Motion for Summary Judgment will be granted as to Plaintiff's official policy or custom of deliberate indifference claim.

### IV.    CONCLUSION

For the reasons stated herein, Defendant CCS's Motion for Summary Judgment is **GRANTED**.  ECF No. 50.

Because the Court has determined summary judgment is warranted in favor of Defendant CCS, the remaining motions in limine—and Plaintiff's motions for extension to reply to said motions in limine—are **DISMISSED as moot**, ECF Nos. 46, 48, 57, 59.  In addition, Defendant CCS's Motion for Leave to File Supplemental Brief and Plaintiff's Motion to Amend his Expert Witness Report are **DISMISSED as moot**.  ECF Nos. 55, 61.  As the Court has now disposed of Plaintiff's remaining claims against Defendant CCS, the Clerk is **DIRECTED** to enter judgment in favor of Defendant CCS.

Plaintiff may appeal from this Order by forwarding a written notice of appeal to the Clerk of the United States District Court, Norfolk Division, 600 Granby Street, Norfolk, Virginia 23510. The written notice must be received by the Clerk within thirty (30) days from the date of the entry of this Order.

The Clerk is further **DIRECTED** to forward a copy of this Order to all Counsel of Record.

**IT IS SO ORDERED**.

/s/
Robert G. Doumar
Senior United States District Judge
UNITED STATES DISTRICT JUDGE

Norfolk, VA
May 8, 2020